# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO.  03-24-00158-CV

### K. B., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-22-005771, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

K.B. (Mother) appeals the trial court's final decree of termination, following a jury trial, terminating her parental rights to her child (Kevin), who was four years old at the time of trial.[1]  In five issues, Mother asserts that the evidence is legally and factually insufficient to support the trial court's findings that statutory grounds for termination exist, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), and that termination of her parental rights is in Kevin's best interest, *see id.* § 161.001(b)(2), and, additionally, Mother contends that there was error in the court's charge.  We will affirm.

---

[1]  For the child's privacy, we refer to him using a pseudonym and to his parents and other relatives by their familial relationships to each other.  *See* Tex. R. App. P. 9.8.

## BACKGROUND

In July 2022, Mother was living in her own apartment with Kevin and working when Kevin was in daycare. Mother had recently successfully completed an eighteen-month program with the Travis County Family Drug Court in connection with a prior suit brought by the Texas Department of Family and Protective Services (the Department) against Mother and Kevin's father (Father).[2] Following her graduation from the drug-court program, in May 2022, the trial court signed an agreed order appointing Mother as temporary sole managing conservator; appointing Father, who failed to successfully complete the drug-court program, as temporary possessory conservator, with supervised possession; and dismissing the Department's suit.

Around 7:30 a.m. on July 21, 2022, while Kevin was at daycare, Mother discovered Father passed out in his vehicle in front of her apartment. Mother suspected that Father was high on drugs, and she assisted him into her apartment. For several hours, Father lay on the couch as Mother worked on household chores. Around 2 p.m., Mother checked Father's pulse and, believing that he was not in immediate distress, left the house to purchase marijuana. A few hours after she returned, Mother checked on Father and observed that his appearance had deteriorated and that he was not breathing. At approximately 4:30 p.m., Mother called 9-1-1, and upon arrival, EMS discovered that Father had died from an apparent overdose.

Two days later, members of Father's family arrived to collect his belongings, and Father's cousin and his wife offered to let Kevin stay with them for a week, to which Mother

---

[2] According to the evidence presented at trial, parents with Department cases that participate in the Travis County Family Drug Court program receive fully funded drug-rehabilitation services. During the program, the child remains in the custody of his or her parents, and upon successful completion of the program, the pending case may be dismissed by the Department.

agreed. That same day, the Department received a referral alleging that Father had died from a fentanyl overdose and that Mother and Father had used drugs together the night before. During the investigation that followed, Mother admitted that on the night before Father's death, she had taken Father to purchase illegal drugs and that Kevin was with them. Mother also told the Department investigator that she had been prescribed Adderall but had recently started taking Adderall obtained without a prescription, or "street Adderall." She told the investigator that she had been taking the "street Adderall" for the last month and that she had recently learned that it may contain a "micrometer of methamphetamine." In addition, during a conversation with Mother, the investigator suspected that Mother was under the influence, and when the investigator questioned her about his suspicion, Mother confirmed that she had taken "street Adderall" that day. When the Department asked Mother to submit to a drug test, Mother stated that she would likely test positive for methamphetamine, amphetamine, and marijuana, which she did.

On August 2, 2022, the Department filed a petition to terminate Mother's parental rights and sought the emergency removal of Kevin from Mother's care. In October 2022, following an adversary hearing, the Department obtained emergency temporary managing conservatorship, and Kevin was formally placed with Father's cousin and his wife (foster parents).[3] In addition, the trial court ordered Mother to "[s]ubmit to random drug screenings within twenty-four hours of the Department's request, at a location provided by the Department" and to "[a]ttend and actively participate in individual counseling that shall address parenting and substance abuse . . . and follow all recommendations until successfully discharged."

---

[3] This is the same cousin and wife that Mother agreed to let Kevin stay with two days after Father's death, and Kevin has resided with them since that time.

In February 2024, the trial court conducted a five-day jury trial on the Department's petition to terminate. The evidence presented at trial included testimony by Mother, the Department Investigator, the Department conservatorship caseworker, the Travis County Family Drug Court caseworker, the CASA (Court-Appointed Special Advocates) volunteer, Mother's mother, Mother's sister, Kevin's paternal grandparents, and Kevin's foster parents. At the conclusion of the proceedings, the trial court signed a final decree in accordance with the jury's verdict, terminating Mother's parental rights and appointing the Department as Kevin's sole managing conservator.

## STANDARD OF REVIEW

"While parental rights are of constitutional magnitude, they are not absolute." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). To terminate a parent-child relationship, the Department must prove that (1) the parent's acts or omissions constitute at least one of the enumerated statutory grounds for termination, and (2) termination is in the child's best interest. Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements by clear and convincing evidence. *See* Tex. Fam. Code § 161.001(a). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In an appeal from an order terminating parental rights, we apply a standard of review that reflects this heightened standard of proof. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.

4

2002).  In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to the finding may be considered."  *In re A.C.*, 560 S.W.3d at 631.  When evaluating the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the finding and consider any undisputed contrary evidence to decide whether "a reasonable factfinder could have formed a firm belief or conviction that the finding was true."  *Id.*  A factual-sufficiency review, in contrast, requires "weighing disputed evidence contrary to the finding against all the evidence favoring the finding."  *Id.*  "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true."  *Id.*

## ANALYSIS

In three issues, Mother challenges the legal and factual sufficiency of the evidence supporting the jury's findings as to each statutory ground alleged by the Department and found by the trial court—namely, subsections (D), (E), and (O) of Section 161.001(b)(1), and as to the jury's best-interest finding.  We will begin our analysis with Mother's argument that the evidence is insufficient to support the trial court's findings of endangerment under subsection (E).  *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (holding that due process requires appellate courts to review challenged subsection (D) and subsection (E) findings, even when factfinder made another statutory finding upon which termination could be upheld).

*Endangering Conduct*

A trial court may order termination of the parent-child relationship under subsection (E) if clear and convincing evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). When evaluating the evidence with respect to subsection (E), the relevant inquiry is whether the child's physical or emotional well-being was endangered as a direct result of the parent's conduct, including acts and omissions or failures to act. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 711 (Tex. App.—El Paso 2012, no pet.). "Termination under subsection (E) requires more than a single act or omission, and the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent, considering a parent's actions both before and after the child was removed from the home." *T.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00174-CV, 2021 Tex. App. LEXIS 8226, at *19-20 (Tex. App.—Austin Oct. 8, 2021, pet. denied) (mem. op.).

A child is "endangered" if the child is exposed to loss or injury or if the child's emotional or physical health is jeopardized. *D.H. v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 61 (Tex. App.—Austin 2021, no pet.); *A.S.*, 394 S.W.3d at 711. Although endangerment means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), it is not necessary to show that the conduct was directed at the child or that the child suffered injury, *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Moreover, endangerment does not have to be established as an independent proposition.

*A.C. v. Texas Dep't of Fam. & Protective Servs*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (citing *Boyd*, 727 S.W.2d at 533). Instead, a factfinder may reasonably find endangerment from a course of conduct that presents a substantial risk to the child's physical or emotional well-being. *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024).

Although not automatic, a parent's illegal drug use and its effect on his or her ability to parent may qualify as an endangering course of conduct under subsection (E). *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *A.C.*, 577 S.W.3d at 699; *see D.H.*, 652 S.W.3d at 61 ("[I]n some circumstances, a parent's drug use might be so pervasive or serious that the factfinder could reasonably infer that the drug use is endangering, despite a lack of evidence showing that the drug use caused some other endangering activity or even that the drug use occurred while the children were in the parent's direct care."). Drug use exposes the child to the possibility that the parent may be impaired or imprisoned. *J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00274-CV, 2021 Tex. App. LEXIS 9127, at *5 (Tex. App.—Austin Nov. 10, 2021, pet. denied) (mem. op.). Evidence that the parent used illegal drugs while a suit to terminate the parent's rights is pending is especially supportive of termination under subsection (E). *A.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00658-CV, 2024 Tex. App. LEXIS 2560, at *8 (Tex. App.—Austin Apr. 12, 2024, no pet.) (mem. op.). Plus, when a parent fails to attend a scheduled drug test, the factfinder may reasonably infer that the parent was avoiding the test because he or she was using drugs. *S.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00695-CV, 2022 Tex. App. LEXIS 4662, at *35 (Tex. App.—Austin July 8, 2022, pet. denied) (mem. op.) (citing *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.)).

In this case, several witnesses testified as to the length and severity of Mother's illegal drug use. In her testimony, Mother described herself as a drug addict, meaning that she is unable to cope "in a normal way" and instead "tend[s] to turn to drugs." As to her drug use at the time of Father's death, Mother testified that she was sober when she was discharged from the drug-court program but started smoking marijuana again shortly after. She explained that when her psychiatrist found out that she was using marijuana again, the psychiatrist stopped prescribing her Adderall, which Mother had been taking for ADHD. Consequently, Mother "started buying Adderall on the street," and according to her testimony, she later learned that the substance she had been purchasing was not Adderall but instead was a mix of amphetamine and methamphetamine. Nevertheless, Mother continued to take the substance because she had become addicted.

At the time of trial, Mother was residing at Texas Recovery Center (TRC), a drug rehabilitation facility. Mother testified that during the pendency of this case, she had difficulty getting admitted to a rehabilitation facility because she needed to arrive at rehab with a complete thirty-day supply of her psychiatric medications and she was having a hard time getting her prescriptions refilled. She also acknowledged, however, that even after gaining admission to several rehabilitation facilities, she voluntarily left each of those facilities after a short period of time. Mother described one incident where she was discharged from a rehabilitation facility after one day for bringing in alcohol. Upset by the discharge, Mother called a suicide hotline, and a social worker from TRC came and picked her up, and at the time of trial, she had been at TRC for thirty-two days. Mother explained that TRC has been very beneficial because the "people care here, and they have doctors on-site that can help . . . stabilize you" and "nurses on-site every single—twenty four hours a day to help medicate symptoms." Mother also admitted,

8

however, that during the pendency of this case, she had used methamphetamine and marijuana and that she had done so as recently as six weeks before trial.

Mother testified that she has been "to about nine [rehabilitation facilities] over the course of [her] whole life" but ended up leaving five of those facilities within twenty-four hours. She also testified that she was currently on step four of the twelve-step program for sobriety and that she has previously completed the twelve-step program "at least six times." Nevertheless, Mother told the jury that she believed this time would be different and that she would maintain her sobriety because she now has a child and wants "to be a good mom to him" and for him "to be safe, and I am not providing him a happy, and healthy life if I'm using drugs." Mother explained that her attempts to stay sober have been negatively impacted by the recent death of her father and her mother's cancer diagnosis, and later by Father's death and Kevin's removal. Mother testified that she was scheduled to be successfully discharged from TRC a few days after trial; that after leaving TRC, she planned to go into a year-long, sober-living housing program for women; and that Kevin would be allowed to live with her at the sober-living housing.

As to the events surrounding Father's death, Kevin's foster mother testified that on the day of Father's death, she talked to Mother on the phone. According to foster mother's testimony, in that phone call, Mother told her that "[Father] had gotten paid the day before and that they had gone and bought . . . Percocet, cocaine, and [Xanax] bars. And I said, and what, you proceeded to just do these drugs? Yes. . . . So that means that she and the baby drove back to the apartment by themselves. But she had been doing drugs with [Father] too." Similarly, in her testimony, Mother admitted to taking Father to purchase illegal narcotics the night before, that she took Kevin with them, and that Father had a seizure in the car as Mother drove him back to his home. Mother also acknowledged knowing that Father had almost overdosed three times

9

in the three months prior to his death, but on the day of his death, she did not call 9-1-1 until she discovered that he was not breathing, hours after finding him passed out in his vehicle.

Mother's caseworker from the Travis County Drug Court testified as to the services that Mother received when she was in the drug-court program, including ninety days of inpatient treatment, outpatient therapy, housing assistance, and parent education. The caseworker testified that Mother had struggled with addiction since she was seventeen, that she had been sober for a year before the birth of Kevin, and that she was prescribed Suboxone for heroin withdrawal while she was in the drug-court program. According to the drug-court caseworker, Mother was optimistic about her recovery when she first entered the drug-court program, but she later began to express that "she didn't think she should really be in drug court, she shouldn't have that CPS case." In addition, the caseworker testified that the drug-court program provided many free services that ordinarily are not available to parents and that to be successfully discharged from the program, Mother had to maintain her sobriety for six months. According to the caseworker, Mother was tested for drugs eighteen times while she was in the program and did not test positive for any drugs other than Suboxone.

Finally, the Department conservatorship caseworker testified that between November 2022 and February 2023, Mother was asked to take fifteen to twenty drug tests but only took four to six tests. In addition, Mother refused to accept the results of those tests when they came back positive for methamphetamine. In March 2023, Mother was asked to engage in an OSAR (Outreach, Screening, Assessment and Referral) evaluation, which she initially failed to do. Once Mother did engage in OSAR, the caseworker made several referrals for her to receive inpatient treatment, but she did not stay in the facilities very long, sometimes not even twenty-four hours. In addition, throughout the case, Mother would tell him that she promised

10

that she was going to stay sober, but she would not. Finally, he explained that based on Mother's history and her actions in this case, he did not believe that she would be able to successfully maintain her sobriety after leaving TRC.

Based on this record, the jury could have reasonably determined that Mother has a serious and on-going problem with drugs, including methamphetamine, which began before Kevin was removed from her custody and continued afterwards, and that this drug use poses a "substantial risk to [Kevin's] physical or emotional well-being. *See In re R.R.A.*, 687 S.W.3d at 277. After considering all the evidence in the light most favorable to the jury's finding, along with any undisputed evidence contrary to the finding under subsection (E), we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother's illegal drug use constitutes a course of conduct that endangered Kevin's physical or emotional well-being. *See A.C.*, 560 S.W.3d at 630-31; Tex. Fam. Code § 161.001(b)(1)(E). In addition, in view of the entire record, we conclude that the disputed evidence is not so significant that the jury could not have formed a firm belief or conviction that Mother engaged in endangering conduct. *See A.C.*, 560 S.W.3d at 631. We overrule Mother's second issue on appeal.

Because proof of one statutory predicate ground is sufficient to support termination, we need not consider Mother's challenges to the sufficiency of the evidence supporting termination under subsection (D) and (O), her first and third issues on appeal. *See* Tex. R. App. P. 47.1.

### *Best-Interest Finding*

Next, we consider Mother's argument that the evidence is factually and legally insufficient to support the jury's best-interest finding. *See* Tex. Fam. Code § 161.001(b)(2).

11

"[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." *Id*. § 263.307(a). We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*: the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

Proof concerning the statutory predicate under section 161.001(b)(1) does not relieve the Department of proving that termination is in the best interest of the child, but "the same evidence may be probative of both issues." *C.H.*, 89 S.W.3d at 28. Moreover, in evaluating a parent's fitness for providing for a child, a factfinder may measure a parent's future conduct by her past conduct. *V.P.*, 2020 Tex. App. LEXIS 938, at *23-24. As previously

detailed, the jury heard evidence from which it could reasonably conclude that Mother engaged in endangering conduct—that she has a long history with illegal drug use and an inability to remain sober, despite repeated attempts to do so, even when termination of her parental rights is at stake.

In addition, the jury heard testimony from several witnesses concerning the stability of Kevin's foster parents, who stated they wish to adopt him. Kevin's foster mother testified that he has a great relationship with them and with their daughter and that he is like a son to them. Kevin enjoys being outside, playing sports, making pancakes, and spending time with his paternal grandparent and paternal half-siblings. Foster mother also explained that it is important to her that Kevin maintain a relationship with his maternal grandmother, Mother's mother, and that they currently spend a lot of time together and have a close relationship. Foster mother testified that when Kevin first arrived at their home, he would have frequent tantrums and that anything could "trigger" him emotionally. However, Kevin has never required therapy for his behavior, and in the months that have followed, his behavior has improved. In addition, Kevin goes to school and plays with friends, and his foster parents plan to enroll him in soccer and other after-school activities "to develop other skills and just help him to grow to the individual that he needs to be." Finally, foster mother testified that even if Mother's parental rights were terminated, she would encourage a relationship between Mother and Kevin, so long as "she's sober and has a good attitude."

The jury was also presented with evidence suggesting that termination of Mother's parental rights is not in Kevin's best interest. Specifically, Mother's drug-court caseworker and Department conservatorship caseworker testified that Mother and Kevin appear to have a good relationship and that there is no indication that Kevin has been physically harmed

13

or that his basic needs have not been met while in Mother's care. In addition, neither the caseworkers nor investigator expressed any concern with the condition of Mother's apartment or with Kevin's physical or emotional development at the time of removal, and there was no evidence that Kevin has special medical needs. The conservatorship caseworker did, however, express concern that during the pendency of the case, Mother has been unable to maintain stable housing and reliable transportation.

As to Mother's plans for the future, including her plans for Kevin, the jury heard that she plans to live in a year-long sober housing and that once she could verify that it was a "good, healthy, sober environment," Kevin could live with her there. Mother also plans to continue to work on her mental health and to find a stable job and a daycare for Kevin. As to her financial stability, Mother stated that she would soon be receiving a substantial inheritance from her father's estate, and that once she receives that inheritance, she plans to hire a financial advisor who could set up a trust that would allow her to receive money for her monthly basic bills. Finally, she testified that if her parental rights were not terminated and the foster parents instead were appointed as conservators, she would work on her relationship with the foster parents.

The CASA volunteer testified that at the beginning of this case, CASA was concerned about Kevin's safety and stability and that those concerns had not been alleviated because during this case, Mother had failed to test negative for drugs, follow through on recommendations for individual therapy, and take responsibility for her actions. The volunteer acknowledged that Mother's visits with Kevin "went very well" and that they have a "a good mother-son relationship" but stated that CASA was recommending termination of Mother's

14

rights and not conservatorship because the relationship between Mother and the foster parents is not "a trusting relationship" and it "would be very disruptive to Kevin."

There is a strong presumption that a child's best interest will be served by preserving the parent-child relationship, *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam), and parental rights may not be terminated merely because a child might be better off living somewhere else, *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). Nevertheless, a factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered. *V.P.*, 2020 Tex. App. LEXIS 938, at *29 (citing *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 354 (Tex. App.—Austin 1993, no writ), *disapproved of by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002)).

Considering all the evidence in the light most favorable to the best-interest finding, and considering undisputed contrary evidence, we conclude a "reasonable factfinder could form a firm belief or conviction" that termination of Mother's parental rights is in Kevin's best interest. *See A.C.*, 560 S.W.3d at 630-31. In addition, viewing the evidence in a neutral light and weighing all the evidence, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the best-interest finding is not so significant that the factfinder could not have formed a firm belief or conviction that termination of Mother's parental rights was in Kevin's best interest. *See id.* at 631. Because the evidence is legally and factually sufficient to support the jury's best-interest finding, we overrule Mother's fourth issue on appeal.

*Charge Error*

Finally, in her fifth issue, Mother contends that the trial court erred in submitting a charge that asked the jury to consider whether her parental rights should be terminated before considering whether she should be appointed managing conservator under the parental presumption.[4]  In response, the Department contends that "this issue is inadequately briefed, and therefore waived."  *See* Tex. R. App. P. 38.1(i).  Assuming without deciding that this issue has been adequately preserved for review, we cannot conclude that the trial court abused its discretion in its organization of the charge.  *See Rogers v. Texas Dep't of Fam. & Protective Servs.*, 175 S.W.3d 370, 375 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.) ("We review jury charge error under an abuse-of-discretion standard, and a trial court abuses its discretion only when it acts without reference to any guiding principle.").

Because an order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to the child, Tex. Fam. Code § 161.206, when the court terminates parental-rights as to both parents or to the only living parent, it must appoint "a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator," *id.* § 161.207, and the parental presumption does not apply, *see In re M.M.M.*, NO. 01-16-00998-CV, 2017 Tex. App. LEXIS 5554, at *50 (Tex. App.—Houston [1st Dist.] June 16, 2017, no pet.) (mem. op.).  For this reason, courts of appeals have recognized that when a decision to terminate the parental rights is upheld or unchallenged on appeal, the parent lacks standing to challenge that portion of the decree appointing a

---

[4] Under the parental presumption, a child's parent or parents must be named managing conservators of the child, unless the trial court finds that appointment of the parent or parents as managing conservators would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development. Tex. Fam. Code § 153.131.

managing conservator. *J.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-24-00017-CV, 2024 Tex. App. LEXIS 4674, at \*34-35 (Tex. App.—Austin July 3, 2024, no pet.) (mem. op.); *see also In re C.J.B.*, No. 05-19-00165-CV, 2019 Tex. App. LEXIS 7470, at \*29 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.).

Because a parent whose parental rights have been terminated cannot be appointed as a managing conservator, the trial court did not abuse its discretion by conditioning the jury's consideration of Mother's appointment as managing conservator on negative finding on the issue of whether her parental rights should be terminated. We conclude that there is no error in the jury charge and that the trial court did not abuse its discretion. We overrule Mother's fifth issue on appeal.

## CONCLUSION

Having overruled all of Mother's issues on appeal, we affirm the trial court's decree of termination.

_____

Chari L. Kelly, Justice

Before Justices Baker, Triana, and Kelly

Affirmed

Filed: August 22, 2024

17